

**LORI S. SIMPSON**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | |
| Nolan David Clifford, | * | Case No. 17-19329-LSS |
| Debtor. | * | Chapter 7 |
| | * | |
| * * * * * * | * | * * * * * * |
| Angie Bowers Sanchez, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Adv. No. 17-00453 |
| | * | |
| Nolan Clifford, | * | |
| Defendant. | * | |
| | * | |

### <u>MEMORANDUM OPINION</u>

Plaintiff objects to the dischargeability of debt pursuant to 11 U.S.C. § 523(a)(6).   This

adversary proceeding focuses on the parties' actions following the termination of their romantic

relationship in 2014. This matter came before the Court for a two-day trial on March 25 and 26,

2019.   The Court took the matter under advisement following the conclusion of the trial.   After

considering the evidence, assessing the reliability of the witnesses' testimony and documentary

evidence, considering the arguments of the parties, and reviewing the record, the Court finds and

concludes that Plaintiff has failed to sustain her burden of establishing a non-dischargeable debt under 11 U.S.C. § 523(a)(6).

## I.      **Findings of Fact.**

In 2010, Plaintiff, a single parent to three children (the "Children") and a Texas native, resided in Martinsburg, West Virginia.   Defendant resided approximately an hour's drive away in Frederick, Maryland.   In late 2010, Plaintiff met Defendant and the two began a whirlwind romance.   Plaintiff was not accustomed to Defendant's lifestyle and she felt pampered in the early part of their relationship.   The parties went on international vacations, at which time Plaintiff occasionally left her children in the care of a friend, Michelle Landers.

In June 2011, Plaintiff moved to Frederick.   Soon thereafter, Plaintiff grew dissatisfied in the relationship.   What began with excitement and novelty, gave way to accumulating disappointment and suspicion.   In addition, Plaintiff's job grew more stressful, including a temporary assignment to a war zone.   The parties began to argue, sometimes dramatically. Defendant exhibited aggression and showed increasing disinterest in Plaintiff.   Likewise, Plaintiff acted-out in aggression.   Increasingly, Plaintiff consumed alcohol to excess, leading to embarrassing outcomes.   Toward the end of the parties' romantic relationship, Plaintiff sought therapy for psychological and emotional issues.   After a series of break-ups and reconciliations beginning late Summer 2013, the parties' romantic relationship permanently ended in early 2014.

Around March 2014, Defendant, Ms. Landers, and others began assisting David Johnson, the Children's father, in obtaining primary custody of the Children.   At that time, Mr. Johnson retained Lorraine Prete to initiate child custody proceedings in Maryland.   Defendant paid Ms. Prete's retainer on Mr. Johnson's behalf.

On March 5, 2014, Defendant contacted the Children.   Defendant informed the Children

that he would no longer be a part of their life, but that he wished them the best.   He also informed them that he had made the acquaintance of Mr. Johnson and hinted that he would be assisting their father in obtaining primary custody of them.   Upon arriving home, the Children informed Plaintiff of their conversation with Defendant, which angered Plaintiff.   As soon as she was able, Plaintiff went to the Frederick County, Maryland, Sherriff's Department to file for a protective order against Defendant.   To her surprise, Defendant was already there, filing for a protective order against her. Soon thereafter, Defendant and Ms. Landers visited the local office of the Maryland Child Protective Services ("CPS") and filed a report with CPS stating that Plaintiff was endangering the Children.

To avoid the risk of protective orders being entered against them, both parties agreed to enter into a no contact agreement to be drafted by Defendant's counsel, Lorraine Prete.   On March 21, 2014, the parties executed such an agreement (the "Agreement").[1]   The main thrust of the Agreement was the parties' promise to "have no future contact and physical abstinence from" one another and the other's children.   The Agreement prohibits the parties from contact with or harassment of one another, "whether physical or via text, email, phone calls or internet or social media."   The parties further agreed to "not commit or threaten to commit" any act that places the other "in fear or imminent serious bodily harm; assault; rape, attempted rape, sexual offense, or attempted sexual offense; false imprisonment; harassment; stalking; trespass; or malicious destruction of property," and not enter the other's residence.   Finally, the parties agreed that, "[i]f a party enters a dining establishment and the other party is already there, the second party entering will leave the establishment."   The Agreement included a provision entitling the prevailing party to reimbursement of attorney's fees in an action to enforce the provisions of the Agreement.   The

---

[1]  Plaintiff's Exhibit 1.

3

Agreement contained no provision regarding its duration.

The group of Defendant, Ms. Landers, and others continued their efforts to obtain evidence of Plaintiff's lack of fitness as a parent.   Defendant was motivated by a belief, whether justified or not, that Mr. Johnson would be a better custodial parent than Plaintiff.   However, Defendant also relished in the apparent decline in Plaintiff's mental health and resulting turmoil in her life.   The evidence shows that the group was responsible for some very troubling behavior, including rummaging through Plaintiff's trash and placing a GPS tracking unit on her vehicle.   However, except for the incidents described below, the evidence does not show that Defendant committed or motivated those acts.   The reliable evidence merely shows Defendant's awareness of and keen interest in the events.

On May 11, 2014, Plaintiff was at a local winery for an event with her daughter.   Defendant arrived at the winery with a friend while Plaintiff was there.   Defendant purchased some wine and left the event without ever interacting with Plaintiff.   However, Defendant's friend took photographs of Plaintiff, and provided those photographs to Defendant.   Defendant then provided those photographs to Mr. Johnson.   Following this encounter, Plaintiff contacted a real estate agent to begin the process of selling her home in Frederick.   Soon thereafter, Plaintiff met the real estate agent at a local bar and grill style restaurant.   Defendant noticed Plaintiff's car parked at the restaurant.   Defendant contacted an acquaintance and requested that the acquaintance enter the restaurant to photograph Plaintiff drinking alcohol.   The acquaintance did so and provided the photographs to Defendant, who provided them to Mr. Johnson.

In June 2014, Plaintiff relocated to Texas.   Plaintiff was unable to sell her home in Frederick prior to moving.   In February 2015, Plaintiff and the mortgage holder agreed to a short sale of Plaintiff's home.   During this time, Plaintiff continued therapy for emotional and

4

psychological issues.   Following Plaintiff's move, Mr. Johnson initiated child custody proceedings in Texas.   Defendant helped fund Mr. Johnson's custody battle in Texas.   In total, Defendant paid $30,000.00 to $40,000.00 of Mr. Johnson's legal fees in the Maryland and Texas custody battles. Ultimately, Mr. Johnson became the custodial parent for the Children, with Plaintiff receiving occasional weekend visitations.   Since moving to Texas, Plaintiff has continued her career as an engineer and has happily married.

On July 18, 2016, Plaintiff filed a Complaint and Jury Demand (the "State Court Complaint") against Defendant in the Circuit Court for Frederick County, Maryland (the "State Court Action").   Plaintiff asserted two causes of action in the State Court Complaint, breach of contract and intentional infliction of emotional distress.   The facts Plaintiff alleged in the State Court Complaint address the same matters as were addressed in the Complaint filed herein. Plaintiff incurred $61,686.59 in total attorney's fees in the State Court Action.[2]

On July 10, 2017, Defendant filed a Chapter 11 Voluntary Petition, thereby initiating the underlying bankruptcy case, Case No. 17-19329-LSS.   On August 3, 2017, Defendant filed his Schedule E/F, wherein he listed Plaintiff's unsecured claim as disputed and for an unknown amount.[3]   On August 18, 2017, Plaintiff filed a proof of claim in Defendant's bankruptcy case.[4] Plaintiff asserted a $750,000.00 unsecured claim, the basis of which Plaintiff identified as "loan guarantys."[5]   Plaintiff attached a copy of the State Court Complaint and the Agreement to her claim.[6]   On August 23, 2017, Defendant filed an amended Schedule E/F, listing a contingent,

---

[2]  *See* Plaintiff's Exhibit 3.
[3]  Case No. 17-19329-LSS, Dkt. No. 21, p. 18.
[4]  Case No. 17-19329-LSS, Claim No. 6-1.
[5]  Case No. 17-19329-LSS, Claim No. 6-1.   The Court infers that this was a typographical error as there is no mention of loan guaranties in the documents attached to the claim or in this adversary proceeding.
[6]  Case No. 17-19329-LSS, Claim No. 6-1, Part 2.

unliquidated, and disputed, unsecured claim of $750,000.00 held by Plaintiff .[7]

On November 14, 2017, Plaintiff filed her Complaint Objecting to Dischargeability (the "Complaint").[8]   In the Complaint, Plaintiff asserts one claim, a request for denial of discharge pursuant to 11 U.S.C. § 523(a)(6).   Plaintiff requests that the Court enter a judgment against Defendant in the amount of $750,000.00 and declare that judgment to be non-dischargeable. Defendant filed a timely answer.   Plaintiff incurred approximately $22,000.00 in attorney's fees in this adversary proceeding.

On March 2, 2018, the Court entered an Order converting Defendant's bankruptcy case to a case under Chapter 7.[9]   On June 14, 2018, the Court entered an Order of Discharge, granting Defendant a discharge under 11 U.S.C. § 727.[10]

## II.   Conclusions of Law.

### A.   Section 523 Overview.

The cornerstone of the bankruptcy system is the discharge of debts.   However, the Section 523 of the Bankruptcy Code excludes certain debts from discharge.   *See generally* 11 U.S.C. § 523(a).   Establishing a non-dischargeable debt under Section 523 requires a two-step process. First, the creditor must establish the existence of a debt under non-bankruptcy law, commonly state law.   Thereafter, the Court must determine whether the debt is non-dischargeable.   Section 523 does not, independently, give rise to a claim for damages, i.e. a debt.   *See In re Janssens,* 449 B.R. 42, 66 (Bankr. D. Md. 2010), *aff'd sub nom. Janssens v. Freedom Med., Inc.*, CIV. JFM-10-2042, 2011 WL 1642575 (D. Md. Apr. 29, 2011).   Where the plaintiff has not previously liquidated the debt arising under non-bankruptcy law, the bankruptcy court has subject matter jurisdiction to

---

[7] Case No. 17-19329-LSS, Dkt. No. 29, p. 18.
[8] Dkt. No. 1.
[9] Case No. 17-19329-LSS, Dkt. No. 96.
[10] Case No. 17-19329-LSS, Dkt. No. 121.

determine the existence and amount of such debt.   *In re Freeland*, 360 B.R. 108, 129 (Bankr. D.

Md. 2006).   *See also Saenz v. Gomez*, 899 F.3d 384, 390 (5th Cir. 2018) (reviewing the Supreme

Court decision in *Stern v. Marshall*, 564 U.S. 462 (2011) and concluding that liquidation of claims

is a core matter).   "In determining the existence and the amount of the debt, the bankruptcy court is

required to apply the relevant State law according to which the debt arose."   *Id.* (*citing Grogan v.

Garner*, 498 U.S. 279, 283–84 (1991)).   In other words, "[n]onbankruptcy law governs whether the

claimant holds a claim . . ., while bankruptcy law determines whether that claim is [non-

dischargeable]."   Scott F. Norberg, <u>Contract Claims and the "Willful and Malicious Injury"</u>

<u>Exception to the Discharge in Bankruptcy</u>, 88 Am. Bankr. L.J. 175, n. 23 (2014).

###   B.      Establishment of a Debt.

Plaintiff did not include a claim under non-bankruptcy law in her Complaint.   However, the

Court may deem the pleadings amended to include issues tried by consent.   *See* Fed. R. Civ. P.

14(b)(2), Fed. R. Bankr. P. 7014.   Plaintiff asserted breach of contract and intentional infliction of

emotional distress in the State Court Action.   Both parties referenced the Agreement numerous

times in their pleadings and at trial. Further, both parties referenced the Agreement and Plaintiff's

claim for intentional infliction of emotional distress in their respective pre-trial statements.[11]

Accordingly, the parties implicitly consented to try those claims in this adversary proceeding.

Plaintiff raised a third claim, one for Champerty, in her counsel's closing argument.[12]   Defendant

---

[11] Dkt. Nos. 15 and 17.

[12] Champerty is a rare common law tort with questionable continuing validity under Maryland law.   *See Abbott v. Gordon*, CIV.A. DKC 09-0372, 2011 WL 828646, at *17 (D. Md. Mar. 7, 2011) (discussing the history and modern day applicability of champerty and maintenance).   Under Maryland law, "[m]aintenance exists when a person 'without interest' in a suit officiously intermeddles by assisting either party, . . . champerty adds the element of an agreement for payment from the subject matter of the suit." *Schackow v. Med.-Leg. Consulting Serv., Inc.*, 416 A.2d 1303, 1312 (Md. Spec. App. 1980) (*quoting Lahocki v. Contee Sand & Gravel Co.*, 41 Md. App. 579, 608, 398 A.2d 490, 507 (1979). Both champerty and the related statutory claim of barratry require proof that the tortfeasor expect to personally gain from or share in the outcome of the litigation.   *See id. See also* Md. Bus. Occ. & Prof. Code Ann. § 10-604(b) (Maryland barratry statue).   Assuming *arguendo* that such claim was properly before the Court, Plaintiff has not shown, or even asserted, that Defendant personally gained from Mr. Johnson's custody battle.

could not have been aware of this cause of action and certainly did not consent to try it in this adversary proceeding.

             i.       *Breach of Contract.*

Under Maryland law, "[t]o prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001) (*citing Continental Masonry Co., Inc. v. Verdel Const. Co.*, Inc., 369 A.2d 566, 569 (Md. 1977)). The Plaintiff need not "prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Id.* However, to obtain more than nominal damages, the plaintiff must establish that defendant's breach was the cause-in-fact and proximate cause of her damages. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 195–96 (Md. 2012) (discussing causation under Maryland law).

The parties mutually assented to the terms of the Agreement and Defendant owed Plaintiff a contractual obligation to adhere to those terms. The Agreement obligated Defendant to refrain from harassing Plaintiff. Defendant harassed Plaintiff by procuring others to photograph her at restaurants. Defendant's filing a report with CPS and funding Mr. Johnson's custody battle was not harassment and appears to have been motivated by genuine concern for the Children's wellbeing.

As to damages, while the Court is not blind to Defendant's amusement with Plaintiff's mental health struggles, the reliable evidence does not show that Defendant's harassment caused Plaintiff's suffering. Plaintiff's mental health issues began at least as early as the last year of the parties' romantic involvement and continue to date. No reliable evidence connects Defendant's actions to the creation of new emotional problems or the worsening of those that already existed.

Further, the reliable evidence does not show that Defendant's harassment caused Plaintiff to sell her home in Frederick or move to Texas.   However, Plaintiff is entitled to nominal damages for breach of contract as well as, pursuant to the Agreement, an award of attorney's fees incurred to enforce a provision thereof.   Plaintiff presented evidence of her attorney's fees incurred in the State Court Action as well as this adversary proceeding.   However, Plaintiff did not identify which portion of those fees are attributable to enforcement of the Agreement, as opposed to her claims for intentional infliction of emotional distress and non-dischargeability.   Plaintiff's counsel's effort in this proceeding was devoted to her claim for non-dischargeability, on which she is not the prevailing party.   In the absence of evidence to the contrary, the Court finds and concludes that no meaningful portion of Plaintiff's attorney's fees incurred in this adversary proceeding are attributable to enforcement of the Agreement.   However, her breach of contract claim was meaningful part of her State Court Action.   Accordingly, the Court finds and concludes that 50% of her attorney fees incurred in the State Court Action were reasonably incurred in enforcement of the Agreement.

<em>ii.      Intentional Infliction of Emotional Distress.</em>

In *Jones v. Fam. Health Centers of Baltimore, Inc.*, 135 F. Supp. 3d 372 (D. Md. 2015), the District Court for the District of Maryland summarized the standard of proof for intentional infliction of emotional distress under Maryland law.   That court held:

> Recovery under IIED is "meted out sparingly" in Maryland, its "balm reserved for those wounds that are truly severe and incapable of healing themselves." *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 502 A.2d 1057, 1065 (Md. Ct. Spec. App. 1986). Four elements must coalesce before liability can be imposed: (1) the conduct at issue must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the conduct and the plaintiff's emotional distress, and (4) such distress must be severe. *Id.* at 1063. Conduct that is merely rude, insensitive, or callous will not satisfy the "extreme and outrageous" prong; rather, the conduct must "completely violate human dignity," threatening to "shatter the frame upon which one's emotional fabric is hung." *Id.* at 1064. As for the resulting distress, it must be "so acute that no reasonable person could be expected to endure" it, and it must leave one "unable to function" and

9

"unable to tend to necessary matters." *Id*. Given these stringent requirements, it comes as no surprise that IIED is "rarely viable" in Maryland. *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997), *aff'd*, 166 F.3d 1208 (4th Cir.1998).

*Id.* at 383.

Defendant was involved with a group that harassed Plaintiff in furtherance of Mr. Johnson's custody battle.   Defendant intentionally procured third parties to take pictures of Plaintiff while she was in public spaces, filed a report against Plaintiff with CPS, and funded a custody battle to remove the Children from Plaintiff's custodial care.   However, no reliable evidence establishes that Defendant was involved in the worst of the harassment.   The public photography was rude, annoying, and unsettling, but it was not completely violative of human dignity.   Reporting Plaintiff to CPS and funding Mr. Johnson's custody battle might be outrageous if completely unfounded. However, there is insufficient reliable evidence to show that Defendant's actions were unjustified.

Defendant was aware that Plaintiff was experiencing mental health issues.   In fact, Defendant believed that Plaintiff's battles with alcoholism endangered the Children.   As stated above, the evidence does not show that Defendant caused, or intended to cause, Plaintiff's severe distress.   Finally, Plaintiff is able to function.   She has maintained her career, married, and continues having a relationship with her Children.   Accordingly, the Court finds in favor of Defendant on Plaintiff's claim for intentional infliction of emotional distress.

### C.      *Nondischargeability Under § 523(a)(6).*

One category of non-dischargeable debts is debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C. § 523(a)(6).   The Fourth Circuit has described the standard of proof under Section 523(a)(6) as follows:

[Section] 523(a)(6) applies only to acts done with the actual intent to cause injury. Section 523(a)(6) is not satisfied by negligent, grossly negligent or reckless conduct. Moreover, the mere fact that a debtor engaged in an intentional act does not necessarily mean that he acted willfully and maliciously for purposes of § 523(a)(6).

> Nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.

*In re Duncan*, 448 F.3d 725, 729 (4th Cir. 2006) (internal quotations omitted).   It is well settled that mere breach of contract is insufficient to render a debt non-dischargeable under Section 523(a)(6).   *See e.g., In re Anderson,* 15-18781-WIL, 2018 WL 1475981, at \*22 (Bankr. D. Md. Mar. 23, 2018), *aff'd*, CV TDC-18-0977, 2019 WL 1227925 (D. Md. Mar. 15, 2019).   However, [b]reaches of contract that involve intentional or substantially certain injury may be sufficient for § 523(a)(6) purposes. *Id.* (*citing In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003)).

As previously stated, the evidence does not show that Defendant intended to harm Plaintiff. Defendant intended to assist Mr. Johnson in obtaining custody of the Children.   Defendant, rightly or wrongly, believed that it was in the Children's best interests to be in Mr. Johnson's custody.   His acts were not calculated to scare or intimidate Plaintiff.   In fact, he took measures to keep Plaintiff unaware of his acts.   Accordingly, the Court finds and concludes that Plaintiff's claim for non-dischargeability under Section 523(a)(6) should be denied.

## III.    Conclusion.

Based on the foregoing, the Court finds and concludes that it should find in favor of Plaintiff on her claim for breach of contract, with an award of $30,843.30.   The Court further finds and concludes that that it should find in favor of Defendant on Plaintiff's claims for intentional infliction of emotional distress and for nondischargeability.   The Court will enter a judgment consistent with this Memorandum Opinion.

cc:    All parties

**End of Order**